**E-FILED**
Tuesday, 04 May, 2010  04:46:48 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF ILLINOIS - SPRINGFIELD DIVISION

DANIEL T. WESTRICK,             )
                                )
                Plaintiff,      )
                                )
        v.                      )       No. 09-3017
                                )
MICHAEL J. ASTRUE,              )
COMMISSIONER OF                 )
SOCIAL SECURITY,                )
                                )
                Defendant.      )

## OPINION

CHARLES  H. EVANS, U.S. Magistrate Judge:

Plaintiff Daniel T. Westrick appeals from the Defendant Commissioner's final decision to deny his application for Disability Insurance Benefits (Disability Benefits).  42 U.S.C. §§ 416(i) & 423.  The parties consented, pursuant to 28 U.S.C. § 636(c), to have this matter proceed before this Court.  Consent to Proceed Before a United States Magistrate Judge, and Order of Reference (d/e 14).  The Plaintiff has filed a Brief.  Brief in Support of Complaint (d/e 16).  The Defendant Commissioner has filed a motion for summary judgment.  Motion for Summary Affirmance (d/e 17).  This Court has jurisdiction to hear this

appeal.  42 U.S.C. § 405(g).  For the reasons set forth below, the Court affirms   the Commissioner's decision and allows the Commissioner's Motion for  Summary  Affirmance.

<u>STATEMENT OF FACTS</u>

Westrick was born on October 25, 1962.  He graduated from high school and completed two years of college in business accounting.  <u>Answer (d/e 12)</u>, attached <u>Certified Record of Proceedings Before the Social Security Administration (R.)</u>, at 38.  He worked as a billing clerk, a night stocker, and a meat cutter.  R. 65-66.  He alleged that he became disabled on April 1, 2005.

In 1999, Westrick was diagnosed with single vessel coronary artery disease and had a stent put into a blood vessel in his heart.  R. 213.  He had  no  further  problems  with  his  heart  until  2004,  when  he  started experiencing  heart  palpitations  and  chest  pains.   On  May  29,  2004, Westrick went to the emergency room with chest pains.  The test results were normal.  He was given a prescription for nitroglycerin.  R. 256.  He saw James C. Mullin, M.D., on August 16, 2004, complaining of chest pains.  Dr. Mullin adjusted Westrick's blood pressure medicine.  R. 213-18.

2

Westrick went to the emergency room on January 11, 2005, complaining of rapid heart rate and shortness of breath. Test results were normal. R. 239.

On March 27, 2005, Westrick went to the emergency room complaining of back pain. He was diagnosed with back spasms and received a prescription for Vicodin for pain. R. 235-36. On May 18, 2005, Westrick went to see John A. Peterson, M.D., for low back pain and leg numbness. R. 304-05. Dr. Peterson recommended an MRI. R. 305. On May 19, 2005, Westrick saw a physical therapist. R. 222. On May 24, 2005, Westrick went to the emergency room with chest pain. The test results were normal. R. 228.

On June 2, 2005, Westrick saw Dr. Peterson again for back pain. Dr. Peterson scheduled an MRI. On June 7, 2005, Westrick underwent an MRI of his back. The test showed disc degeneration in the lumbar spine and mild osteoarthritic changes. R. 226. On August 11, 2005, Dr. Peterson referred Westrick for epidural injections and an EMG study. On August 25, 2005, Claude Fortin, M.D., conducted the EMG study. He diagnosed radiculopathy on the right side of Westrick's lumbar

spine.  R. 265.

On September 1, 2005, Westrick saw Dr. Peterson again for back pain.  Dr. Peterson restricted him to five-hour work days with a lifting restriction.  Dr. Peterson switched Westrick's pain medication from Vicodin to Tylenol 3.  R. 299.  On September 27, 2005, Westrick saw an orthopedist, Timothy VanFleet, M.D.  Dr. VanFleet's notes indicate that Westrick could move his hips and knees without pain and that he had full strength, sensation, and reflexes in all extremities.  R. 312.  Dr. VanFleet ordered a discogram.  R. 313.  The discogram was performed on October 5, 2005.  The test showed some annular disruptions in the lumbar spine, but no pain responses during the test.  R. 315.

That same day, October, 5, 2005, after undergoing the discogram, Westrick went to the emergency room with heart palpitations.  The test results at that time were normal.  R. 336.  Westrick was released and instructed to continue his usual medications.  R. 336.

On November 7, 2005, a state agency reviewer, Paul Smalley, M.D., completed a physical residual functional capacity (RFC) assessment.  Dr. Smalley opined that Westrick's medical records showed degenerative disc

disease, but no diagnosis related to his heart.  Dr. Smalley opined that Westrick could lift 20 pounds occasionally, lift 10 pounds frequently, stand, walk or sit for six hours in an eight-hour work day, climb ramps and stairs frequently, occasionally balance, stoop, kneel, crouch or crawl, but could never climb ladders, ropes, or scaffolds, or be exposed to hazards.  R. 320-23.

On November 18, 2005, Westrick went to the emergency room with complaints of chest pain.  The test results were normal.  R. 330.  On January 5, 2006, Westrick went to see Dr. Mullin again.  Dr. Mullin noted that Westrick's cardiac test results were normal.  Dr. Mullin diagnosed atypical chest pain symptoms.  R. 360-63.  On February 6, 2006, Stephen Mayer, M.D., performed a cardiac catheterization.  R. 348-50.  The test revealed mild coronary disease that did not require intervention.  R. 343-44, 371-72.  Dr. Mayer recommended that Westrick restart statin medications for high cholesterol.

On May 11, 2006, Westrick went to see Dr. Mullin again.  Westrick reported that he still had heart palpitations.  Westrick said that the palpitations were no more frequent or bothersome than they had been for

several years.  R. 364-65.  Dr. Mullin concluded that Westrick's heart condition was controlled with medication.  R. 367.  Dr. Mullin noted that Westrick reported that he could mow the lawn with a push mower.  Dr. Mullin opined that Westrick should be able to walk twenty to thirty minutes at a time.  R. 367.

Westrick underwent physical therapy for his back in July 2006. Westrick reported to the therapist that he made his back condition worse in August 2006 while remodeling his home.  Westrick was unloading drywall for the remodeling project.  R. 448.

On September 20, 2006,Westrick went to the emergency room with heart palpitations.  The tests were normal.  R. 422-23, 430-41.

On May 25, 2007, Westrick saw Dr. VanFleet for back pain.  Dr. VanFleet  found  Westrick's back, neck, and waist flexion, strength, reflexes, and sensation were all normal.  R. 407.  X-rays of the back showed normal disc spacing.  Dr. VanFleet diagnosed chronic pain syndrome.  R. 407.  Dr. VanFleet recommended that Westrick continue with stretching and strengthening exercises.  R. 408.

On June 12, 2007, Westrick went to see a psychologist, Russell

Taylor, Ph.D.  Westrick reported feelings of depression and anxiety.
Westrick had no suicidal thoughts or crying spells.  His memory and
concentration were intact.  R. 545.  He said that his left hand shook, but
Dr. Taylor did not observe any tremor.  R. 545.  Dr. Taylor assigned
Westrick a Global Assessment of Functioning (GAF) score of 55.  R. 545.
Dr. Taylor diagnosed mild to moderate depressive disorder secondary to
Westrick's medical conditions, and anxiety disorder secondary to
Westrick's physical limitations and financial stressors.  R. 545.

Westrick saw Dr. Taylor again on July 17, 2007.  Westrick
described his daily activities as getting up around 5:00 a.m., cleaning,
driving, going shopping, and paying bills.  R. 547.  He reported that he was
considering volunteering, but was worried about his disability application.
He reported taking Tylenol 3 once or twice a week.  R. 547.  Dr. Taylor
noted some improvement in Westrick's condition.  R. 547.  On July 31,
2007, Westrick went to see Dr. Peterson for depression and anxiety.  R.
530.  Dr. Peterson prescribed Zoloft and recommended seeing Dr. Taylor
again.  R. 531.

On September 17, 2007, Dr. Peterson completed a medial source

statement regarding Westrick's condition.   Dr. Peterson opined that Westrick could lift and carry ten pounds occasionally and less than ten pounds frequently, could stand and/or walk for less than two hours in an eight-hour day, occasionally balance, could perform limited pushing and pulling, but could never climb, kneel, crouch, crawl, stoop, or be exposed to hazards, including heights or ladders.  R. 550-53.  Dr. Peterson further opined that Westrick had no limitations on sitting and no impairment in his ability to perform manipulations with his hands, but noted a right-hand tremor.  R. 551.  Dr. Peterson stated that the limitations were based on Westrick's complaints of pain rather than medical test findings.  R. 551.

The Administrative Law Judge (ALJ) conducted a hearing on September 19, 2007.  R. 30-83.  Westrick appeared at the hearing with his attorney.  Vocational expert Bonnie Gladden was also present.  Westrick and Gladden testified at the hearing.

Westrick testified that he lived with his wife and three children, ages 14, 15, and 17.  R. 36.  Westrick testified that he last worked driving cars to auctions for an automobile dealership.  He made less than $1,000.00 over a three-month period.  He testified that he had to quit due to back

pain.  He had worked as a meat cutter for 14 years until November 3, 2005.  He quit because he injured his back and could no longer stand.  R. 39.

Westrick  testified  that in a typical day he got out of bed at 6:00 a.m., took  his pills, got his children ready for school, and watched television for the rest of the morning.  In the afternoon, he watched television and napped.  He sometimes ran errands or went to the doctor. R. 42, 56.  In the evening, he again watched television.  On the weekends he watched his 14-year-old son who has ADD.  He stated that he did not have a social life.  He collected stamps. R. 45-46.

Westrick testified that he did some cooking and loaded clothes into the washer and dryer.  He had difficulty folding clean clothes and putting them away because he had to stand to perform these tasks.  R. 43. Westrick made beds and changed sheets.  R. 44.  He washed some dishes, but could not wash a great deal of dishes because he could not stand for long periods of time.  R. 43.  Westrick went grocery shopping, but had difficulty making it all the way around the store.  He would need to lean over and hang onto the cart by the end.  R. 44.  He last mowed the lawn in

June 2007.  R. 46.  He used a riding mower at the time.  His oldest son had mowed the lawn since then.  R. 60.  He did no other yard work because he experienced shortness of breath.  R. 45-46, 60.

Westrick testified that his back pain was the major reason he could not work.  R. 49.  Westrick said that he could sit for 30 to 45 minutes at a time.  R. 53.  Westrick testified that he could only stand for 15 minutes. After that, he experienced pain in his lower right side.  R. 54.  Westrick testified that he could walk a couple hundred yards at one time.  R. 54.  He said that he could not crouch, bend, or kneel.  R. 54.   He  said that he could not lift a laundry basket.  He estimated that he could not lift more than ten pounds.  R. 53-54.

Westrick  testified that he had a constant tremor in his right hand. R. 57.  He testified that he was right-handed.  R. 58.  He testified that his left hand also shook, but not all the time.  R. 57.  He testified that his hands went to sleep on him three to four times a day.  R. 57-58.  Westrick testified that his left arm sometimes went numb also.  R. 58.  Westrick testified that he had difficulty writing because of the problems with his right hand.  R. 58.  He dropped things, such as pens and coins, regularly.

10

He could pick up a coin only with great difficulty.  R. 59.

Westrick testified that his ankles would  swell  if he sat for more  than  three  hours.  R. 62.  Westrick also testified that he had sleep apnea.  He would wake  up  four  times a night on average.  He took an afternoon nap regularly for about 90 minutes.  R. 63.

Gladden  then  testified.   Gladden  testified  that  Westrick's  prior relevant  work  was as a night stock clerk, billing clerk, and meat cutter. The  billing  clerk  was sedentary; the other two were rated as heavy physical work.  R. 66.     Westrick's  work  as  a driver did not count because he did not earn enough to qualify the job as substantial gainful activity.  R. 66, 70.

The ALJ and Gladden had the following colloquy:

Q.    All right. . . .  Please assume a person the age of 44 with a  high  school-plus  education,  and  the  past  relevant  work experience  that  you  have  identified.   Please assume that I find this person capable of performing the exertional demands of light  work  as  defined  in  the  Social  Security  regulations. Specifically, lift, carry, push, pull 20 pounds occasionally, 10 pounds  frequently.   Could  stand  and  walk for six out of eight, for a total of eight out of eight.   Occasional climb, balance, stoop, crouch, kneel, crawl.   There should be no exposure to ladders, ropes, or scaffolds.  Regarding that hypothetical, would there be transferable work in the economy?

11

A.    The billing clerk work and the education-plus could transfer into other types of clerical or clerk work, including bookkeeping, payroll, time clerks, procurement clerks.  Any of those types could be performed at a sedentary level.  Most of those – most of that type of work, however, is more sedentary than it is light.  There are light jobs, but most of them do involve more sitting, although it's not – doesn't have to be constant.

Q.    Specifically, these skills would be what?

A.    Data entry, use of office machines, the clerical part of the work, and of course mathematical skills.

Q.    How would these restrictions affect the performance of past relevant work?

A.    The meat cutting work is extremely heavy at the type that he was doing, so that could not be performed.  The rest of it – oh, and not the night stock clerk either.   Just the billing clerk . . . could still be performed under that hypothetical.

Q.    I'm  going to ask you a second hypothetical.  Again assume a person the age of 44 with a high school-plus education, the past relevant work experience you have identified.  This time please assume I will find this person capable of performing the exertional demands of sedentary work  as  defined in the Social Security regulations. Specifically, the person can lift, carry, push, pull ten pounds occasionally, and less than ten pounds frequently.  Person could stand, walk for two out of eight, sit for six out of eight, but would require a sit-stand option.  Person could occasionally climb, balance, stoop, crouch, kneel, or crawl.  No ladders, ropes, scaffolds.  Only occasional use of the lower extremities for  the like of foot pedals and such.  And no exposure to moving machinery.  With regard to that hypothetical

12

would there still be transferable work skills?

A.     Yes, into the sedentary level of both the clerk and billing clerk.  The other ones I listed, payroll and timing – timekeeping.

Q.     How would these restrictions affect the performance of past relevant work?

A.     It was the only one sedentary job that was listed, and that's that of a billing clerk.  All the rest would be eliminated.

Q.     Could the duties of a billing clerk be performed with a sit-stand option?

A.     Yes.

R. 66-68.  Gladden then listed a number of other clerical jobs that the person described in the second hypothetical question could perform. R. 68-69.   Gladden  also testified that if the person in the hypothetical had only limited ability for manipulations of his hands, he could not perform the billing clerk job or any other sedentary job because those usually required frequent use of the hands.  R. 82.

The  ALJ  issued  his decision on December 17, 2007.  R. 17.  The ALJ followed the five-step analysis set forth in the Social Security Administration regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  Such severe impairments are set forth in an appendix to the regulations referred to as the Listings.  20 C.F.R. Part 404 Subpart P, Appendix 1.  The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his past relevant work considering his RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step;   the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Westrick met his burden at Steps 1 and 2.   The ALJ determined that Westrick was not engaged in substantial gainful activity and that he had a severe impairment due to a disorder of the back.  R. 19.  The ALJ determined that Westrick did not have a severe impairment based on his heart palpitations or angina, or based on his claims of depression.  R. 20-22.  At Step 3, the ALJ determined that Westrick's condition did not meet any Listing.  R. 22.

At Step 4, the ALJ found that Westrick had the RFC to lift or carry ten pounds occasionally and less than ten pounds frequently; stand or walk up to two hours; sit or stand for up to six hours in an eight-hour day; occasionally climb, balance, stoop, crouch, kneel or crawl; occasionally use his lower extremities for foot control; never use ladders, ropes or scaffolding; and avoid exposure to machinery and unprotected heights.  R. 22.  In coming to this determination, the ALJ found that

Westrick's testimony about the severity of his pain was not credible. The ALJ stated that the medical evidence did not support Westrick's claims of limiting pain, in particular, Dr. VanFleet's May 25, 2007, examination and Dr. Peterson's medical source statement in September 2007. The ALJ noted that Dr. Peterson opined that Westrick had no limitations on sitting and no limitations on manipulative functioning of his hands. R. 24. Westrick's statements that he could only sit for 30 to 45 minutes or stand for 15 minutes were not consistent with this medical evidence. R. 24. The ALJ also stated that Westrick's level of daily activity was not consistent with the claims of persistent pain. R. 24. The ALJ then determined at Step 4 that Westrick could perform his past relevant work as a billing clerk. R. 25. The ALJ, therefore, concluded that Westrick was not disabled. R. 25-26.

Westrick appealed the decision to the Commissioner's Appeals Council. On November 21, 2008, the Appeals Council denied Westrick's request for review. R. 2. Westrick then brought this action.

<u>ANALYSIS</u>

Westrick raises three issues on appeal: (1) the ALJ erred in making

16

his credibility determination; (2) the ALJ's RFC determination is unsupported by substantial evidence because his right-hand tremor and his need for a daily nap limited his ability to perform sedentary work; and (3) the ALJ erred in posing hypothetical questions to the vocational expert because the questions did not include limitations well documented in the record.

This Court reviews the ALJ's decision to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must  accept the ALJ's findings if they are supported by substantial evidence,  and may not substitute its judgment for that of the ALJ. <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).    The ALJ further must articulate at least minimally his analysis of all relevant evidence. <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able  to  "track" the analysis to determine whether the ALJ considered all the important evidence.  <u>Diaz v. Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995).

The Court will not overturn the ALJ's credibility finding unless the

findings lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).   In this case, the ALJ's credibility determination is supported by substantial evidence.  Westrick's treating physician, Dr. Peterson, opined that Westrick had no limitations on his ability to sit during an eight-hour work day, and no limitations on his ability to perform manipulations with his hands.  These opinions directly contradict Westrick's testimony about his inability to sit and his inability to use his right hand.  The opinions provide substantial evidence to support the ALJ's credibility finding.  Westrick argues that Dr. Peterson made a mistake.   Westrick presents no evidence of any mistake.   In addition, Dr. VanFleet found in his May 25, 2007, examination that Westrick's back, neck, and waist flexion, strength, reflexes, and sensation were all normal.   This evidence also supports the ALJ's conclusions that Westrick's testimony about the severity of his condition was not credible.

Westrick complains that the ALJ misused the factors established for evaluating credibility.   See SSR 96-7p (setting forth factors for evaluating credibility).  Westrick also argues that the ALJ did not give specific  reasons for his credibility determination.  The Court disagrees.

18

The ALJ referenced the relevant factors and explained the basis for his credibility finding in the context of the factors. The ALJ also cited specific medical evidence to explain his decision.

Westrick also complains that the ALJ misstated his testimony regarding his daily activities and his ability to pick up coins. The Court agrees that the ALJ overstated some of Westrick's testimony regarding his daily activities. The ALJ also overstated Westrick's testimony regarding his ability to pick up coins. The Court, however, determines that these errors were harmless. The medical evidence cited by the ALJ is sufficient to support his credibility determination. The Court will not disturb that finding.

Westrick next argues that the ALJ erred in omitting the effect of the right-hand tremor and Westrick's need for daily naps from the determination of Westrick's RFC. The Court disagrees. Dr. Peterson noted the tremor in his September 2007 statement, but still opined that Westrick had no limitations in his ability to perform manipulations with his hands. Dr. Peterson is the treating physician. The ALJ relied on his opinion regarding this matter. The opinion of Westrick's treating

physician  constituted substantial evidence to support the ALJ's decision not to include the tremor as a limiting factor that affected Westrick's RFC.

The ALJ also properly did not consider Westrick's claim that he needed a daily  nap when determining Westrick's RFC.  The only evidence of Westrick's need for naps was his own statements.  The ALJ found that Westrick was not credible regarding the severity of his condition,  and the Court will not overturn that finding.  The ALJ, therefore,  properly  discounted  Westrick's testimony that he needed a daily nap.

Last, Westrick argues that the ALJ erred in formulating his hypothetical questions to the vocational expert.  A hypothetical question to  a vocational expert must contain all of the relevant limiting factors in the  claimant's  RFC  in  order to elicit a relevant expert opinion.  See Young v. Barnhart, 362 F.3d 995, 1005 (7th Cir. 2004).  Westrick complains  that  the  ALJ omitted from his hypothetical questions the effects of: (1) Westrick's right-hand tremor, (2) Westrick's need for a nap every afternoon, and (3) Westrick's GAF score of 55.

The Court sees no error in omitting these factors from the hypothetical questions posed to the vocational expert. Substantial evidence supports the ALJ's conclusion that these three matters were not relevant limiting factors that affected Westrick's RFC. As discussed above, Westrick's treating physician, Dr. Peterson, acknowledged the right-hand tremor, but still opined that Westrick had no limitations on his ability to perform manipulations with his hands. Dr. Taylor also did not observe any tremor during his session with Westrick. The ALJ properly did not include the tremor as a factor in his hypothetical question.

The ALJ also properly excluded the GAF score in the hypothetical questions. The GAF score reflected Westrick's mental condition. The ALJ, however, determined that Westrick's mental condition was not a serious impairment at Step 2. Westrick did not appeal this finding. This finding was also supported by substantial evidence. Westrick denied any anxiety attacks, suicidal thoughts, or hallucinations. R. 21, 51-52, 544-45. Westrick's concentration was good and his persistence was above average. R. 21, 55, 545. Dr. Taylor

diagnosed Westrick's depression and anxiety to be mild to moderate. R. 21. This evidence supports the ALJ's conclusion that Westrick's mental impairment was not a severe impairment at Step 2. The ALJ, thus, properly omitted Westrick's mental symptoms, reflected in the GAF score, from his hypothetical questions to the vocational expert.

The ALJ also properly omitted Westrick's claimed need for a nap from the hypothetical questions. As discussed above, Westrick's subjective statements were the only evidence of the claimed need for a nap, and the ALJ determined that Westrick was not credible. The Court will not overturn that credibility finding. The ALJ, therefore, did not need to consider Westrick's claimed need for daily naps when fashioning the hypothetical questions for the vocational expert. There was no error. The ALJ's decision followed the law and was supported by substantial evidence. The Commissioner, therefore, is entitled to summary judgment.

THEREFORE, Defendant Commissioner's Motion for Summary Affirmance (d/e 17) is ALLOWED. The decision of the Commissioner is affirmed. All pending motions are denied as moot. This case is

closed.

IT IS THEREFORE SO ORDERED.

ENTER:  May 4, 2010.

  FOR THE COURT:


       s/Charles H. Evans
      _____
       CHARLES H. EVANS
    UNITED STATES MAGISTRATE JUDGE